CASE NO. 11-17070

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

PETER C. HANSEN

Plaintiff-Appellant

v.

MARK MALLOY, an individual,
STATE OF NEVADA, ex rel., IT'S DEPARTMENT OF PUBLIC SAFETY,
NEVADA HIGHWAY PATROL

Defendant-Appellee


ON APPEAL FROM THE UNITED STATES DISTRICT COURT OF THE
DISTRICT OF NEVADA

(District Court Case No. 3:10-cv-00110-RCJ-VPC)

_____


**APPELLEE'S ANSWERING BRIEF**


CATHERINE CORTEZ MASTO
Attorney General
MICHAEL D. JENSEN
Senior Deputy Attorney General
Nevada Bar Number 4642
555 Wright Way
Carson City, Nevada 89711
(775) 684-4603

## TABLE OF CONTENTS

I.      ISSUE ON APPEAL ...................................................................... 1

II.     STATEMENT OF FACTS ............................................................ 1

III.    SUMMARY OF ARGUMENT ..................................................... 11

IV.     ARGUMENT ................................................................................ 14

        A.      THE DISTRICT COURT PROPERLY FOUND HANSEN DID NOT
                ENGAGE IN PROTECTED SPEECH. .............................................. 16

                1.      The speech contained in the 2007 and 2008 grievances is not
                        protected speech. .................................................................. 16
                2.      The July 2008 telephone call to Chris Perry was not protected
                        Speech ................................................................................ 22
                3.      March 2, 2009 telephone contact with Tony Almaraz was not
                        protected speech ................................................................. 24

        B.      THE ALLEGED PROTECTED SPEECH WAS NOT A
                SUBSTANTIAL OR MOTIVATING FACTOR FOR THE ALLEGED
                ADVERSE EMPLOYMENT ACTIONS ............................................. 25

                1.      The alleged protected speech was not a substantial or
                        motivating factor for the retention in the commercial
                        enforcement position ......................................................... 25
                2.      The alleged protected speech is not a substantial or motivating
                        factor for the 2008 standard performance evaluation. ............. 28
                3.      The alleged protected speech is not a substantial or motivating
                        factor for the written reprimand. ............................................ 32
                4.      The alleged protected speech is not a substantial or motivating
                        factor for the five day suspension. ......................................... 34
                5.      The alleged protected speech is not a substantial or motivating
                        factor for the Biven's statement. ............................................ 35

        C.      THE UNDISPUTED EVIDENCE DEMONSTRATES THE
                ALLEGED ADVERSE EMPLOYMENT ACTIONS WOULD HAVE
                BEEN TAKEN ABSENT THE PROTECTED SPEECH. .................. 36

V.      CONCLUSION ........................................................................... 37

## TABLE OF AUTHORITIES

### CASES

*Allen v. Scribner*, 812 F.2d 426 (9th Cir. 1987)----------------------------------------25

*Bd. of County Commissioners v. Umbehr*, 518 U.S. 668 116 S.Ct. 2342 (1996) --14

*Berg v. Hunter*, 854 F.2d 238, 242 (7th Cir. 1988) --------------------------------20

*Block v. Multnomah County*, 2004 WL 2075416 (D. Or. 2004) ----------------------23

*Brownfield v. Yakima*, 612 F.3d 1140, 1148 (9th Cir. 2010) --------------------- 19, 23

*Burlington Northern and Santa Fe Ry v. White*, 548 U.S. 53, 126 S.Ct. 2405 (2006)
------------------------------------------------------------------------------- 25, 26, 29

*City of San Diego v. John Roe*, 543 U.S. 77, 125 S.Ct. 521 (2004) ---------------- 15

*Clark County School District v. Breeden*, 532 U.S. 268 121 S.Ct. 1508 (2001)----
-------------------------------------------------------------------------------27, 30, 32

*Connick v. Meyers*, 461 U.S. 138 103 S.Ct. 1684 (1983)-------------------- 15, 19, 20

*Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003) ------------------------14, 36

*Desrochers v. City of San Bernadino*, 572 F.3d 703 (9th Cir. 2009) --------------------
-------------------------------------------------------------------------17, 19, 20, 21, 25

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009)----------------------------------------- 15,36

*Garcetti v. Ceballos*, 547 U.S. 4101 26 S.Ct. 1951, 164 L.Ed.2d 689 (2006)---------
------------------------------------------------------------------------------- 16, 19, 21

*McGrath v. Nevada Dept. of Public Safety*, 2009 WL 875508, p.2-4 (D. Nev.) ---29

*Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir. 1998)----------------------------15

*Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000) --------------------------------- 28, 29

*Roe v. City and County of San Francisco*, 109 F.3d 578 (9th Cir. 1997) --- 19, 21, 23

*Thomas v. City of Beaverton*, 379 F.3d 802, 806-807 (9th Cir. 2004) ------ 21, 22, 23

*Tucker v. California Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996) -------------- 20,25

*Yartzoff v. Thomas*, 809 F.2d 1371 (9th Cir. 1987) ------------------------------- 28, 29

<u>OTHER AUTHORITIES</u>

NAC 284.177 ..........................................................................................................30

NAC 284.194 ..........................................................................................................30

NAC 284.638...............................................................................................29, 30, 32, 33

## I.    ISSUE ON APPEAL

Whether the District Court properly granted summary judgment in favor of Mark Malloy on Peter Hansen's First Amendment Retaliation claim?

## II.    STATEMENT OF FACTS

In early 1994, the Appellant, Peter Hansen ("Hansen"), applied for employment with the Nevada Highway Patrol (NHP).  Hansen has been assigned to Wendover, Nevada his entire career with the NHP.  Excerpts of Record (EOR), Vol. II, p. 188.  Hansen understands his duties as a NHP trooper to be patrolling the highways, enforcing traffic laws, providing motorist assistance and looking for debris on roadways.  EOR, Vol. II, p. 187.  He understands his primary duty as a trooper is enforcement action.  The majority of Hansen's work as a trooper is self-initiated.  EOR, Vol. II, p. 187-188.  Hansen was assigned to traffic enforcement from January 1995 through June 2006.  EOR, Vol. II, p. 189.   In June 2006, he was assigned to commercial enforcement.  Id.

The commercial enforcement assignment requires certain training to enable the trooper to perform their duties.  EOR, Vol. II, p. 190.  On a daily basis, the commercial assignment is more or less like a traffic assignment where you patrol the highway, perform motorist assists, but the trooper focuses enforcement efforts on commercial vehicles.  EOR, Vol. II, p. 190-191.  Troopers assigned to traffic enforcement are also required to be certified for Part A (driver's inspections).  Id.  The Federal Government has set certain goals for commercial enforcement.  EOR, Vol. II, p. 193.  As part of the Commercial Vehicle Safety Plan, the NHP has a certain number of inspections it is supposed to do on a statewide basis.  Those goals are divided among the three regions.  EOR, Vol. III, p. 339-340.  There are basically three types of commercial vehicles inspections conducted by troopers.  A Level III inspection is a driver only inspection in which the trooper checks driver related issues such as medical cards, logbooks, registration, and license.  A Level II

includes the things covered in a Level III inspection, and a walk around mechanical inspection on the vehicle checking such things as lights, horn, wipers, and tires.  A Level I inspection includes all of the things covered in a Level III and Level II inspection plus crawling under the vehicle to check things like steering linkage, suspension and brakes.  EOR, Vol. II, p. 195-196.

Each commercial trooper records the number and type of inspections they perform on a NHP Form 186 form (186 Form).  EOR, Vol. III, p. 322-323.  The 186 Form contains a statement of the goals of 45 Level II and III inspections per month, and 6 Level I inspections per month.  EOR, Vol. III, p. 322-323, 326-327. Next to these stated goals are boxes which contain the total number of Level I and the combined total number of Level II and III inspections the trooper has completed for the month.  The numbers in these boxes changes color from red to green when the trooper's inspections for the month reach these goals.  EOR, Vol. III, p. 328.  Even after the trooper reaches these goals for the month, they are still expected to continue to do their job and remain diligent throughout the day.  EOR, Vol. III, p. 328-329.  It takes Hansen about ½ hour to complete a Level I inspection, approximately 20-25 minutes to do a Level II inspection, and approximately 15 minutes to do a Level III inspection.  EOR, Vol. II, p. 197-198. While assigned to commercial enforcement, he works a 10 hour shift.  He takes 1 hour for lunch.  He normally does not need to go to the office to do paperwork, as he does the paperwork while doing the inspections.  EOR, Vol. II, p. 198-199.

In his performance evaluation for 2006, he received a "Meets Standard" ratings for Job Element #2 (traffic enforcement) and Job Element #13 (commercial enforcement).  EOR, Vol. III, p. 398-407.  However, under the "Rater's Comments" for Job Element #13, it reads as follows:

> You performed 177 inspections during the rating period, for an average of 35.4/month.  This is below the unit average of 46.8/month.  You are above the unit average

in Level One of 4.27/month, with your average being 5/month. Your average for Level 2/3 Inspections is 29.6/month. This is below the unit average of 41.09/month. As you progress in Commercial Operations and gain more knowledge and experience these averages must increase. You have been documenting good violations, with a higher than average violations/inspections ratio. You have spent 60.5 hours on secondary scale assignments. You weighed 10 vehicles during the period and did not write any overweight citations. I have taken various factors into consideration, such as, you joining commercial in June 2006. I expect improvement in this area during the next rating period. Please remain consistent with your peers in all areas of enforcement activity.

EOR, Vol. III, p. 407. Through his evaluation, Hansen understood that he was to remain consistent with his peers working at an enforcement level at or near the averages of his peers. He understood he was being compared to the averages of his peers in terms of enforcement activity. EOR, Vol. II, p. 212-213. He agreed with the evaluation and he did not grieve the method by which his enforcement activity was being evaluated. EOR, Vol. II, p. 213. He did not express any concerns with the method of evaluation to his sergeant or anyone within the Department at that time. EOR, Vol. II, p. 214. When his supervisor told him to stay consistent with the averages of his peers, Hansen understood that to be a suggestion and not an instruction. EOR, Vol. II, p. 214.

On his performance evaluation for 2007, Hansen received an overall "Meets Standards" rating; however, he received "Does Not Meet Standards" (DMS) ratings on Job Elements #2 (traffic enforcement) and Job Element #13 (commercial enforcement). EOR, Vol. III, p. 408-437. Hansen disagreed with his ratings in both areas. In his deposition, Hansen stated the only reason he disagreed with his ratings in these two areas was that he believed he was being evaluated against his peers and not his Work Performance Standards. EOR, Vol. II, p. 215-216. Hansen does not dispute any of the statistics set out in his 2007 Evaluation. EOR, Vol. II, p. 216-220, 224. The evaluation states that Hansen is 44.2 percent behind his peers

in Level 1 inspections and 54.7 percent behind his peers in Level 2 inspections. Hansen agrees his inspection numbers are substantially below his peers. EOR, Vol. II, p. 220. He averaged 3.6 Level 1 inspections per month. Hansen was aware his supervisor expected him to be consistent with his peers with regard to inspections. EOR, Vol. II, p. 223.

Lt. Tom Merschel completed the evaluation review on Hansen's 2007 evaluation. EOR, Vol. II, p. 225; Vol. III, p. 408-437, 335-336, 525-544. During 2007 evaluation period, Hansen had access to other troopers' inspection numbers on their 186 forms. He does not recall ever looking at those numbers even though he was told to be consistent with his peers in the 2006 Evaluation. EOR, Vol. II, p. 226-227. He averaged 3.7 inspections per day after giving him the benefit for time off. EOR, Vol. II, p. 228. Hansen agrees this is about 2 hours a day spent on inspections during a 10 hour shift. Id. In his Review Memo, Lt. Merschel observes that if the other commercial troopers had performed at Hansen's level for inspections, the region would not have met its federal goals. EOR, Vol. II, p. 337-338.

The reason troopers do inspections on commercial vehicles is for commercial vehicle safety. EOR, Vol. II, p. 229-230. There are several commercial vehicle safety issues that cannot be seen just by driving around a vehicle. To find those safety issues, you have to stop the vehicle and do an inspection. EOR, Vol. II, p. 231. Despite the legal authority to do so, Hansen does not like to stop commercial vehicles without probable cause of a violation. He prefers to do inspections around commercial vehicle checksites. EOR, Vol. II, p. 229-230. In his review memo, Merschel stated, "During this rating period, you were not spending your work time to be a productive commercial or traffic trooper when 50% of your work time is spent in service not assigned to any activity."

EOR, Vol. III, p. 535-544.  For the reasons stated in his memo, Merschel agreed with the ratings on Job Elements #2 and #13.  Id.

Hansen filed a grievance with regard to these DMS ratings.  EOR, Vol. III, p. 438-448.  In his grievance, Hansen references that he is being evaluated based on region goals and against the averages of his co-workers.  Id.  p. 439.  In the "Proposed solution" section of the Grievance, Hansen writes:  "Ensure that the evaluation process strictly adhere to the requirements of the DPS Standing Orders, the NRS, the duties of Troopers in the DPS-NHP are assigned and expected to do."  Id. p. 441.  Hansen disagreed with the review of his grievance at each level within the agency.  EOR, Vol. III, p. 438-448.  Hansen escalated the grievance to the Employee Management Committee (EMC).  Id.  The EMC heard Hansen's Grievance on October 8, 2008.  EOR, Vol. III, p. 449-453.  The EMC denied Hansen's Grievance.  Id.  In its Findings of Fact, Conclusions of Law and Decision (Decision), the EMC ruled as follows:

> Trooper Hansen has constructive knowledge of the minimum standards and how they are calculated.  The DPS's methodology for evaluating troopers is not arbitrary and capricious.  It has been in place for a long time and Trooper Hansen was aware of it.  His evaluation was very thorough and well-documented.  Due to the unique nature of the job, the evaluation must include both objective and subjective components.  If 50% of his time on the road is unaccounted for, the Committee feels Trooper Hansen can put forth more effort to increase his productivity.

Id. at p. 452.

During 2008, there were 3 traffic and 1 commercial enforcement positions assigned to Wendover.  In approximately January of 2008, Trooper Munoz, one of the traffic troopers assigned to Wendover, went out on extended leave due to an off duty injury.  In March 2008, Trooper Nick Pearl, a second traffic trooper assigned to Wendover, had a serious on duty automobile accident for which he went on

extended leave.  Trooper Nick Pearl was never able to return to full duty.  With two of the three troopers out on extended leave, Hansen was assigned to a traffic assignment to provide necessary coverage in the area effective April 1, 2008.  Hansen retained his same shift, days off, same vehicle, and he remained in the same area.  The assignment had no effect on his employment pay, leave, or benefits.  The only change was his emphasis on normal vehicle traffic as opposed to commercial vehicles. All troopers in the Central Command are required to be certified to perform Level III commercial driver inspections and traffic troopers are supposed to be involved in some commercial enforcement as part of their duties.  EOR, Vol. IV, p. 652.  Hansen agrees there was a legitimate business reason to assign him to traffic enforcement at this time.  EOR, Vol. II, p. 242.

In approximately July 2008, Hansen learned he was going to remain in the traffic enforcement assignment.  Hansen called Col. Chris Perry, Chief of the NHP.  EOR, Vol. II, p. 243.  Hansen told Perry he thought it was not fair to leave him the traffic assignment.  Hansen was concerned that he was going to lose his status as a commercial enforcement officer.  EOR, Vol. III, p. 344-345.  Hansen expressed that he felt that by re-assigning him to a traffic function they were going to forget about him, and he was not going to be able to keep up his commercial certifications.  He was also concerned that he had been assigned a traffic radio call number. Finally, he was concerned that he would be reporting to a sergeant in Wells.  He was concerned the Sgt. would try to micromanage him.  Id.  Col. Perry stated that this was a temporary assignment.  They were waiting for a cadet to graduate from the academy and complete field training so he could go to Wendover, Nevada, to assist with traffic enforcement.  Id.  He permitted him to retain his commercial enforcement radio call number, and he told him they would provide him with at least one opportunity a month to work commercial vehicle check sites in order to maintain his commercial enforcement level I certifications.

Id.  Col. Perry sent Hansen a memo documenting the conversation.  EOR, Vol. III, p. 530-531.

In December 2008, Hansen received his Performance Evaluation.  EOR, Vol. III, p. 454-470.  He received an overall "Meets Standards" rating on the evaluation.  However, he received DMS ratings on Job Elements 1, 2, 13, 14, 15. EOR, Vol. II, p. 246.  All of the DMS ratings relate to his lack of enforcement activity.  During the first three months of 2008, while Hansen was still assigned to commercial enforcement, his inspection activity decreased by 33 percent from the inspection activity documented in his 2007 Evaluation.  EOR, Vol. II, p. 248. Hansen concedes that during December 2007 through March 2008 his commercial enforcement activity actually decreased from his 2007 DMS commercial enforcement activity.  EOR, Vol. II, p. 248-249; Vol. III, p. 159-461.  During the remaining months of the 2008 evaluation period, Hansen's traffic enforcement activity is documented for each month and is compared to the traffic enforcement activity of his peers in the Wells District.  Hansen does not dispute any of the numbers in the 2008 Evaluation.  As noted in his evaluation, Hansen's enforcement activity is between 46 percent and 80 percent less than his co-workers in the Wells District for each month during the 2008 evaluation period.  EOR, Vol. II, p. 250.  Hansen agrees 46 to 80 percent below the average of his peers is activity substantially below his peers.  EOR, Vol. II, p. 292.  Under "Development Plan and Suggestions," Hansen agreed to make at least 1 traffic stop per hour and 8 traffic stops per 10 hour shift with consideration to be made for un-obligated time (time doing activities other than patrolling highways).  The Evaluation contained blank lines for the number of stops per hour and per shift which were filled in by Hansen when he received his evaluation.  He was also told to strive to maintain a citation ratio of at least 70% as related to actual stops.  EOR, Vol. IV, p. 551.

Hansen disagreed with the DMS ratings in his 2008 Evaluation and requested review. EOR, Vol. III, p. 455. Lt. Stephanie Bivens did the evaluation review, and she created a memo regarding her review. EOR, Vol. III, p. 471-474. Lt. Bivens agreed with the 2008 evaluation. Hansen was given his 2008 Evaluation on December 7, 2008. EOR, Vol. IV, p. 645-646. At the same time, Hansen was given a Written Reprimand for his failure to improve his enforcement activity following instruction to do so in his 2006 and 2007 performance evaluations. EOR, Vol. III, p. 475-477. At the time he was given his 2008 Evaluation and Written Reprimand, Hansen admitted that he could do better with his activity. He stated that there had been several times during the past year that he could not look himself in the mirror when he got home. Hansen said he felt that way because he did not give a full day of work. EOR, Vol. II, p. 254-255; EOR, Vol. IV, p. 645-646. On December 16, 2008, Hansen filed a grievance on the Written Reprimand, and on December 22, 2008, Hansen filed a grievance on the 2008 Evaluation. EOR, Vol. II, p. 253, 260; Vol. IV, p.645-646. Hansen disagreed at each step of grievance review process within the Department. He appealed his grievances to the EMC. Id. Prior to the time he filed the Grievances, Hansen had received the EMC Decision on his prior Grievance, and he knew that he could not grieve the methodology used by NHP for evaluating enforcement activity including its comparison of his enforcement activity to the enforcement activity of his peers. EOR, Vol. II, p. 259-260.

On September 9, 2009, the EMC held a hearing on Hansen's Grievances. EOR, Vol. III, p. 492-497. In its Findings of Fact, Conclusions of Law and Decision, the EMC denied Hansen's Grievances. Id. In its Decision, the EMC concluded the following:

> With 15 years of experience as a trooper, Trooper Hansen's claim that he did not know what was expected of him is not credible. Since his 2007 evaluation and since his prior hearing before the EMC, Trooper Hansen has been on notice of what was expected of him and that his performance was deficient. However, Trooper Hansen has done nothing to improve his performance. His attitude indicates a lack of cooperativeness and teamwork. The agency acted within its authority and discretion by issuing the written reprimand.

Id. at p. 495-496.

On March 4, 2009, Hansen was issued a Specificity of Charges recommending a 5 day suspension without pay for failure to improve his enforcement activity. EOR, Vol. II, p. 293-294; EOR, Vol. III, p. 500-512. During the time period December 8, 2008 through January 31, 2009, Hansen averaged 1 vehicle stop per 2.5 hours or 4 vehicle stops per 10 hour shift. EOR, Vol. II, p. 296; EOR, Vol. III, p. 507. Hansen does not dispute these numbers. With an overestimation of lost time, Hansen averaged 1 traffic stop per 2.1 hours worked and 4.7 traffic stops per 10 hour shift. EOR, Vol. II, p. 296-297; EOR, Vol. III, p. 507-508. Hansen only had a slight improvement over his 2008 Evaluation DMS enforcement activity. EOR, Vol. III, p. 508. Despite the fact he had agreed to make at least 1 traffic stop per hour and 8 traffic stops per shift, he did not do so. EOR, Vol. II, p. 296. Hansen admits that it is possible to make one traffic stop an hour and eight traffic stops during a ten hour shift. EOR, Vol. II, p. 295. He also admits that personally he has been able to do so. During the same time frame, the troopers in the Well's district were able to average 8.7 traffic stops per 10 hour shift. EOR, Vol. III, p. 508. Hansen agrees that during this time frame he would need to almost double his efforts to reach consistency with his peers. EOR, Vol. II, p. 297-298. Hansen does not dispute the numbers in the SOC. EOR, Vol. II, p. 296-298.

A pre-disciplinary hearing was held on the SOC. EOR, Vol. IV, p. 654, 707-716. Lt. Dave Jones, Nevada Division of Investigations, acted as the Pre-

disciplinary hearing officer.  Lt. Jones upheld the recommendation of a 5 day suspension without pay through a written recommendation.  Id.  Lt. Jones is in a different division and he is not in Malloy's chain of command. Id.  Hansen has no evidence Lt. Jones made his recommendation for reasons other than those stated in his memo.  EOR, Vol. II, p. 302.  The Director's Office reviewed the SOC, and Lt. Jones' recommendation, and agreed with the 5 days suspension.  EOR, Vol. III, p. 360, 498-499.  There is no evidence Phil Brown was motivated by the alleged protected speech to retaliate against Hansen.  EOR, Vol. II, p. 303-304.  Hansen agrees the substandard evaluation ratings for enforcement activity in his 2007 Evaluation, the substandard ratings for enforcement activity in his 2008 Evaluation and Written Reprimand, and only a slight improvement in enforcement activity that was still substantially below his peers would be legitimate reasons for his superiors to impose a 5 day suspension.  EOR, Vol. II, p. 304-305.  Hansen appealed the suspension.  EOR, Vol. II, p. 305.  His appeal did not go to hearing.  Id. Prior to hearing, he agreed to a settlement in which he agreed to the 5 day suspension with revisions to the SOC.  EOR, Vol. II, p. 305-307; Vol. III, p. 500-512.

Through a memo dated February 13, 2009, Hansen was informed that he would remain in his traffic assignment; despite the fact a trooper had finished his field training.  Malloy stated the reason for the continued assignment to traffic enforcement was Hansen's continuing lack of work productivity, and the need for close supervision given the lack of work productivity.  Hansen was informed he would remain in the traffic assignment until the issues are "resolved to satisfactory levels."  EOR, Vol. IV, p. 653, 692-693.  On April 13, 2009, Lt. Stephanie Bivens provided Hansen with the letter from Phil Brown stating the Department's final decision imposing a 5 day suspension.  On that same date, Hansen was provided a memo memorializing the meeting.  In this memo, Hansen is informed his activity

10

for March 2009 shows he has averaged 7.7 stops during a 10 hour shift. Hansen is informed that he needs to reach the agreed upon 8 stops per 10 hours shift by the end of May 2009. If he fails to do so, the division will prepare a second SOC recommending another suspension without pay or termination. EOR, Vol. IV, p. 655, 719-720. Effective October 1, 2009, Trooper Hansen was re-assigned to commercial enforcement. EOR, Vol. IV, p. 656. Malloy approved the re-assignment because Hansen had expressed a desire to be assigned back to commercial, and the fact he had shown over an extended period of time he was doing the job he was supposed to do as a traffic trooper. EOR, Vol. IV, p. 656.

## III.   SUMMARY OF ARGUMENT

Hansen has failed to show that there is a dispute as to genuine issue of material fact on any of the elements of his First Amendment Retaliation Claim. The undisputed facts do not support a legal finding that Hansen engaged in protected speech, or a finding that Malloy retaliated against Hansen for engaging in protected speech. Hansen did not engage in protected speech. The form, content and context of his 2007 and 2008 grievances do not support a legal finding of speech on a matter of public concern. Hansen admits the form and context of his speech is related to his personal employment situation. The actual content of his grievances, as opposed to the post hoc characterizations of the content, does not address matters of concern to the public. Hansen's speech relates to the way his performance, on particular job elements, was evaluated, and the discipline he received when he failed to improve his performance after being instructed to do so. The speech does not address any effects on the operation of the agency, the work conditions and efficiency of other troopers, or any effects on the public at large. The form, context and content of his telephone conversation with Chief Chris Perry do not support a legal finding of speech on a matter of public concern. Even if the claim of retaliation did constitute protected speech, it is undisputed Malloy was not

aware of this allegation; therefore, the speech could not be a substantial motivating factor for any alleged adverse employment action.

Even if the Court were to find Hansen engaged in protected speech, the acts by Malloy are not adverse employment actions which were substantially motivated by Hansen's alleged protected speech. Hansen argues his retention in a traffic assignment for a longer period than he thought was necessary is an adverse employment action. He does not claim the initial re-assignment was an adverse employment action. The undisputed facts do not support a finding that the retention was an adverse employment action. On a daily basis, the commercial assignment is more or less like the traffic assignment. During the time of his reassignment, Hansen was permitted to retain his radio call number, and was given the opportunity at least once a month to work a commercial vehicle checksite in order to maintain his Level I certification. He retained his same shift, days off, patrol vehicle, and he continued to be assigned to the same area. The retention had no effect on his pay or benefits. Hansen admits the retention had no effect on his employment. Additionally, the undisputed facts do not support causation. There is no proximity in time, evidence of opposition to alleged protected speech, and no evidence the reasons given for the retention are false.

The 2008 standard evaluation does not constitute an adverse employment action that was substantially motivated by his alleged protected speech. An overall "Meets Standards" evaluation, even if it contains "Does Not Meet Standards" (DMS) ratings on one or more job elements, has no negative effect on Hansen's employment. Hansen agrees the 2008 Evaluation had no effect on his employment including pay and benefits. The undisputed evidence does not support a finding that the 2008 overall "Meets Standards" evaluation is reasonably likely to deter a person from engaging in protected speech. The Plaintiff has failed to present evidence supporting a finding that the evaluation constituted an adverse

employment action and he has failed to present evidence that his alleged protected speech was a substantial motivating factor for the DMS ratings on the 2008 evaluation. The undisputed evidence demonstrates there were legitimate reasons for the DMS ratings. There is no proximity in time, evidence of opposition to the alleged protected speech, and no evidence the reasons given for the DMS ratings are false or pre-textual.

The written reprimand does not constitute an adverse employment action substantially motivated by Hansen's alleged protected speech. The undisputed evidence demonstrates a legitimate business reason for the Written Reprimand. The undisputed evidence shows Hansen received substantial oral and written instruction to increase his enforcement activity and he failed to do so despite the instruction. The EMC agreed the Written Reprimand was appropriately issued. Hansen admits he has no evidence his alleged protected speech was a substantial motivating factor in the decision to issue the Written Reprimand. There is no proximity in time, evidence of opposition to the alleged protected speech, and no evidence the reasons given for the Written Reprimand were false or pre-textual.

The undisputed evidence shows the five (5) days suspension was issued for legitimate business reasons and not in retaliation for alleged protected speech. Hansen agreed to the imposition of a five (5) days suspension. It would be unreasonable to permit an employee to claim an action constitutes an adverse employment action after they have agreed to imposition of the action. Consent negates the "reasonably likely to deter" finding. Even if the suspension is permitted to be used as an adverse employment action, Hansen has failed to present evidence which demonstrates his alleged protected speech was a substantial motivating factor for the suspension. Hansen has no evidence the reasons given for the suspension are different from those stated in the Specificity of Charges. Hansen agrees the DMS ratings in enforcement activity in the 2007

Evaluation, the DMS ratings in the in the 2008 evaluation, the Written Reprimand for substantially low enforcement activity and only slight improvements following the 2008 Evaluation and Written Reprimand provide a legitimate reason for the suspension. There is no evidence of proximity in time, no statements by Malloy in opposition to the alleged protected speech, and no evidence of the reasons given for the suspension are false or pre-textual.

Finally, the undisputed evidence does not show the Lt. Biven's memo constituted an adverse employment action that was substantially motivated by the alleged protected speech. There was no action taken through this memo, and no action taken as a result of the memo. Hansen has provided no evidence or legal authority to support a finding that a conditional threat of future discipline is an adverse employment action. Again there is no proximity in time, no statements by Malloy in opposition to the alleged protected speech and no evidence given the reasons for the statement in the memo are false or pre-textual.

The undisputed facts support the District Court's order granting summary judgment in favor of Mark Malloy. The legitimate business reasons for the alleged adverse employment actions are undisputed. Hansen has failed to establish there is a genuine issue of material fact remaining for trial on his First Amendment Retaliation Claim. Therefore, Malloy would respectfully request the Court affirm the District Court's order granting summary judgment in his favor.

## IV.   ARGUMENT

In order to establish a claim against a government employer for a violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took "adverse employment action"; and (3) that his or her speech was a "substantial or motivating" factor for the adverse employment action. *Bd. of County Commissioners v. Umbehr*, 518 U.S. 668, 675, 116 S.Ct. 2342 (1996); *Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003);

*Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir. 1998). In *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009), the Court distilled the Supreme Court's prior holdings into a sequential five-step inquiry:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Whether the employee's speech or expressive conduct involves a matter of public concern depends on the content, form, and context of a given statement, as revealed by the whole record. *Connick v. Myers,* 461 U.S. 138, 147-48, 103 S.Ct. 1684 (1983). Further, in *Connick*, the Court stated: "When an employee's expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive government oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146.

In December 2004, in *City of San Diego v. John Roe*, 543 U.S. 77, 83-84,125 S.Ct. 521, 525 – 526 (2004), the Supreme Court, while acknowledging that the boundaries of the public concern test are not well-defined, discussed the parameters of the public concern test as follows: "These cases make clear that public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." "The inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148. The U.S. Supreme Court has long held that a personal grievance is not a matter of public concern, something the Court recently reinforced. "Underlying our cases has been the premise that while the First

Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance." *Garcetti v. Ceballos,* 547 U.S. 410, 420, 126 S.Ct. 1951, 1959 (2006) (*citing Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684 (1983)).

The Plaintiff alleges four incidents of protected speech: (1) His Grievance of the 2007 evaluation; (2) His Contact with Chris Perry on July 7, 2008; (3) His Grievance of the 2008 Evaluation and Written Reprimand; and (4) His attempt to contact Chris Perry through Tony Almaraz.  EOR, Vol. II, p. 232.  A review of the form, context and content of each of these incidents of alleged protected speech disclose they are not speech on a matter of public concern.  The District Court properly granted summary judgment on the First Amendment retaliation claim.

## A.    THE DISTRICT COURT PROPERLY FOUND HANSEN DID NOT ENGAGE IN PROTECTED SPEECH.

### 1.    The speech contained in the 2007 and 2008 grievances is not protected speech.

Hansen acknowledges that the context and form of his grievances was personal to his personal employment situation.  Appellant's Opening Brief, p. 9. Hansen then argues that the content of the grievances espoused a matter of public concern through a claim that he was evaluated contrary to personnel law for state employees.  The alleged violations relate to his claim that he was not evaluated based on his written work performance standards but was instead evaluated as compared to the performance of his peers.  Appellant's Opening Brief, p. 9.  The content, form and context of the alleged protected speech do not support a legal finding of speech on a matter of public concern.

Hansen states his speech raised a public policy question as to whether employees should be evaluated based on "quotas."  Hansen does not point to any speech in his grievances where he raised the issue of quotas.  Significantly, a review of the language of his grievances discloses that he never raised the issue of

"quotas." Comparing Hansen's performance to his peers in various areas of enforcement activity does not create a "quota." To the contrary, Hansen complained that he was not given specific numbers related to enforcement activity that would enable him to be rated as standard. EOR, Vol. III, p. 438-448. In his grievances, Hansen did not allege the methodology used by NHP constituted a quota, he did not allege the methodology used by NHP was resulting in unwarranted enforcement activity by troopers, or that the methodology was leading to decreased efficiency of troopers in the field. EOR, Vol. III, p. 375-391, 438-448, 478-491. Hansen's post hoc characterization of the methodology used to evaluate his performance as a "quota" does not transform his personal grievance, regarding his own evaluations and written reprimand, into to speech on a matter of public concern. The plain language of his grievances differs from Hansen's post hoc characterizations of that speech. In *Desrochers v. City of San Bernadino*, 572 F.3d 703, 711 (9th Cir. 2009), the Court stated, "We look at what the employee actually said, not what they say they said after the fact." The plain language of his grievances does not support a finding of speech on a matter of public concern.

With regard to the personal nature of Hansen's grievances, the District Court, in its Order granting summary judgment, stated:

> Here, it appears beyond dispute that Plaintiff's concern was over the way Malloy evaluated Plaintiff's performance and disciplined him, not over any supposed effect Malloy's evaluations had on the public at large or on the policies of the DPS as they relate to that department's service to the public. For example, the January 2008 grievance is clearly focused on particular elements of Plaintiff's performance evaluation of
>
> December 4, 2007 and whether the performance standards were fairly applied to him. (See, Grievance January 3, 2008, EFC No. 34-7). The December 2008 grievance is likewise focused on particular elements of Plaintiff's performance evaluation of December 7, 2008. (See Grievance, December 22, 2008 ECF No. 34-3). The final line of the December 2008 grievance confirms the

> personal focus: **"I don't have a problem with *my performance* being measured with a measuring stick. I just need to know what the measuring stick is, and know it will not change."** (Id. At Bates 000138, ECF. No. 34-3, at 9 (bold text in original, italics added)). Nowhere in either grievance does the Plaintiff complain of deleterious effects of any policies on any other trooper or the public.

EOR, Vol. I, p. 6.

Hansen also argues that his belief that the NHP methodology violated personnel law transformed his personal grievance into speech on a matter of public concern. Although Hansen alleged the violation of several statutes in his grievances resulting from the NHP's methodology in evaluating his enforcement activity, in his deposition he admitted several of the statutes had not, in fact, been violated. EOR, Vol. II, p. 236; Vol. III, p. 438-448,478-491. He testified that the law that he believes was violated was the law that requires employees to be evaluated according to their written work performance standards. EOR, Vol. II, p. 236-239. While acknowledging there are written work performance standards for his position, he believes the law was violated because those performance standards do not contain a statement that a trooper's enforcement activity will be compared to their peers. Id. A review of the cited statutes, regulations and policies discloses that they do not require NHP to include a description of its evaluation methodology in the written work performance standards. Significantly, the Plaintiff does not cite any statute, regulation or policy that states this type of information must be included in the written work performance standards. The EMC did not find NHP's methodology, and the lack of language describing that methodology in the written work performance standards, constitutes a violation of any personnel law. EOR, Vol. III, p. 449-453, 492-497. Even if this omission constituted a violation of personnel laws, this is not an issue of public concern. Through his grievances, Hansen does not claim the omission created inefficiency in the operation of NHP, or unwarranted enforcement activity. The omission does not constitute criminal

activity or corruption by a public official.   The language of the grievances doesn't address how the omission negatively effects the proper functioning of the NHP, other troopers or the public.   There are no accounts of failed law enforcement efforts, no accounts of inefficiencies created within NHP, no accounts of unwarranted enforcement activity resulting from the methodology.   There is no discussion of duties the NHP is unable to perform in a competent fashion due to the evaluation methodology.   These are post hoc characterizations of the speech not supported by the plain language of the grievances.   Instead, Hansen's speech relates to *his* performance evaluation in the area of his *own* lack of enforcement activity.    The alleged violation of personnel law does not touch on a matter of public concern.

In *Brownfield v. Yakima*, 612 F.3d 1140, 1148 (9th Cir. 2010), the Court stated:

> Although we acknowledged this "broad language" in *Desrochers*, we clarified "that simple references to government functioning" does not "automatically qualify[y] as speech on a matter of public concern." 572 F.3d at 711; see also *Roth v. Veteran's Admin.*, 865 F.2d 1401, 1405 (9th Cir. 1988)("We do not necessarily suggest that all speech concerning public monies or government inefficiencies automatically deserves protection.") overruled in part *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). To the contrary, "the content of the communication must be of broader societal concern.  The focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance." *Roe v. City and County of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997).

The speech in Hansen's grievances conveys little information through which the community could evaluate the functioning of the NHP, and the language of the grievance is of no relevance "beyond the employee's bureaucratic niche." *Desrochers*, 572 F.3d at 713, citing to *Connick*, 461 U.S. at 148, 103 S.Ct. 1684;

*Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996).  In *Desrochers*, the Court stated:

> We have never held that a simple reference to government functioning automatically qualifies as speech on a matter of public concern.  To the contrary, as we recently indicated, the fact that speech contains 'passing references to public safety [,] incidental to the message conveyed' weighs against a finding of public concern. *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009)(internal quotation marks and citations omitted).

*Desrochers*, 572 F.3d at 711.  Hansen's grievances do not even contain passing references to public safety.  "Personal grievances cloaked in the garb of institutional dress are not thereby made matters of public concern."  *Berg v. Hunter*, 854 F.2d 238, 242 (7th Cir. 1988).  "When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  *Connick v. Meyers*, 461 U.S. 138, 147, 103 S.Ct. 1684 (1983).  Hansen has failed to raise a genuine issue of material fact with regard to the speech contained in his grievances.  The undisputed facts do not support a finding that the content of the speech, contained in the 2007 and 2008 Grievances, can "fairly be considered" to relate to a matter of public concern.  *Desrochers*, 572 F.3d at 709-710.

As acknowledged by the Plaintiff, the form of the speech does not lend itself to a finding of public concern.  The fact the speech took the form of an internal employee grievance means the public was never made aware of the Plaintiff's concerns.  On this issue, the *Desrochers* Court stated:

> "That [the employee] expressed his concerns inside rather than publicly, is not dispositive.' *Garcetti v. Ceballos*, 547 U.S. 410, 420, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). We have recognized, however, that "[a] limited audience weigh[s] against [a] claim of protected speech." See *Roe*, 109 F.3d at 585; *McKinley*, 705 F.2d at 1114 ("The result in *Connick* is also explained by the fact that the employee did not seek to inform the public about the operation of a public agency." (internal quotation marks and citation omitted)). The relevance of non-disclosure to the public tracks the Supreme Court's acknowledgement that "the public's interest in receiving the well-informed views of government employees engaging in civic discussion" is one of the primary purposes of its First Amendment retaliation jurisprudence. *Garcetti*, 547 U.S. at 419, 126 S.Ct. 1951. "Public speech is more likely to serve the
>
> public values of the First Amendment. Private speech motivated by an office grievance is less likely to convey the information that is a prerequisite to an informed electorate." *Weeks*, 246 F.3d at 1235 (citation omitted). Thus, though "a private complaint may relate to a matter of public concern," our consideration of the form *Desrochers* and *Lowes* adopted to convey their message "help[s us] identify [whether their] speech … is of public concern. Because the speech at issue took the form of internal employee grievances which were not disseminated to the public, this portion of the *Connick* test cuts against a finding of public concern.

*Desrochers*, 572 F.3d at 714-715. As in *Desrochers*, the speech in this case took the form of internal employee grievances, and Hansen did not report his concerns to anyone outside the agency. EOR, Vol. II, p. 272.

The subject matter of Hansen's grievances concerned only his *own* job treatment. In *Thomas v. City of Beaverton*, 379 F.3d 802, 806-807 (9th Cir. 2004), the plaintiff complained to her supervisor about the city's alleged discriminatory treatment aimed at one of Plaintiff's African-American colleagues. The *Beaverton* Court stated:

> The district court concludes that Thomas' support of [her African-American colleague] for the promotion was not a matter of public concern because her speech was about a personnel matter. However, the type of personnel matter we have deemed unprotected under the public concern

> test are employment grievances in which the employee is complaining about her own job treatment, not personnel matters pertaining to others…Even though Thomas' support for [her colleague] concerned a personnel matter, it did not pertain to Thomas' own job status; therefore, it is the type of personnel matter that can be constitutionally protected under the public concern test.

*Beaverton*, 379 F.3d at 808. In this case, the speech relates to Hansen's own job treatment. It was the DMS ratings in Hansen's evaluations and his written reprimand that motivated his speech. It was clear in his 2006 evaluation that his enforcement activity was being compared to his peers, but he received a meets standards rating in this area. He did not raise his concerns with this methodology to anyone inside, or outside, the NHP until he received a DMS rating in his 2007 evaluation. In his meeting with Malloy regarding the 2007 evaluation, Hansen admitted that he would not be complaining about the methodology used to evaluate his performance if he had received a "meets standards" rating in the enforcement activity areas. EOR, Vol. IV, p. 651, 658-691. The undisputed facts related to the content, form and context of the alleged protected speech do not support a finding of speech on a matter of public concern.

2.    The July 2008 telephone call to Chris Perry was not protected Speech.

Hansen alleges that as part of his telephone conversation with Chief Perry on July 7, 2008 he told Perry he believed Malloy was retaliating against him for filing the 2007 grievance. Appellant's Opening Brief, p. 7, 12. The content, form and context of the speech do not support a finding of speech on a matter of public concern. The content of the speech is set out above. EOR, Vol. III, p. 344-345, 529-531. Hansen was primarily concerned that he was going to lose his status as a commercial trooper. Hansen does not dispute these facts. Instead, he claims that during the telephone call he "protested this as retaliation for filing the grievance on my 2007 evaluation." EOR, Vol. II, p. 164-167. Although Perry did not recall any

statements about retaliation during the telephone call and those statements are not mentioned in the memo documenting the telephone call, the fact is accepted as true for purposes of this appeal. EOR, Vol. III, p. 530-531. This additional fact does not transform speech that is clearly related to an individual personnel matter into speech on a matter of public concern. First, the alleged claim of retaliation relates to Hansen's *own* job treatment and status involving an individual personnel dispute and not personnel matters pertaining to others. *City of Beaverton*, 379 F.3d at 808; *Block v. Multnomah County*, 2004 WL 2075416 (D. Or. 2004)(Internal discrimination complaint that concerns only the treatment of the complaining party was not speech on a matter of public concern). The speech does not expose a broader problem of discrimination, or retaliation within the NHP. A general, conclusory, unsupported allegation of retaliation made by a single employee about their own employment situation is not of even modest relevance to the public in evaluating the functioning of the NHP. *Brownfield*, 612 F.3d at 1148. The communication is not of broader societal concern and the public or community is not truly likely to be interested in the particular expression. The speech is more properly viewed as a private grievance. *Brownfield*, 612 F.3d at 1148, citing to *Roe*, 109 F.3d at 585. Also, the form and context do not support a finding of speech on matter of public concern. Finally, Malloy was not aware of Hansen's alleged speech, to then NHP Chief Perry, relating to Hansen's belief that Malloy was retaliating against him for grieving his 2007 Evaluation. EOR, Vol. II, p. 81-82. Since he was not aware of this speech, it could not have been a substantial or motivating factor for Hansen's retention in the traffic enforcement position. The undisputed facts related to the content, form, and context of the alleged protected speech do not support a finding of speech on a matter of public concern. Hansen has not raised a genuine issue of material fact on this element of his claim. Even if Hansen could establish this was protected speech, which he has not, the alleged

protected speech could not have been a substantial or motivating factor for future alleged adverse employment actions since Malloy was not even aware of this alleged protected speech.  As a result, the District Court properly granted summary judgment on the Plaintiff's First Amendment Retaliation Claim.

3.    March 2, 2009 telephone contact with Tony Almaraz was not protected speech.

The final incident of alleged protected speech occurred during a telephone contact with Tony Almaraz on March 2, 2009.  The form, context and content of this alleged protected speech does not support a finding of speech on a matter of public concern.   With regard to form, content and context of the alleged speech, Hansen testified that he left a message on Linda Gillespie's voicemail the Thursday before March 2nd.  EOR, Vol. II, p. 275.  He received a call back from Major Tony Almaraz on Monday.  The return call occurred while he was on duty. Id.  During the call, Major Almaraz asked why he was trying to contact the Chief. Hansen testified that he told Almaraz that he had been assigned by the Chief some months back to traffic and partly commercial.  EOR, Vol. II, p. 276.  He told him the Chief had assigned him there for a period until somebody transferred back into Wendover, or Trooper Pearl was released back to full duty status, or Trooper John Boykin was released off his field training to work on his own in Wendover. Hansen said he notified Almaraz that Malloy had recently told him that he would not be reassigned to commercial due to his low activity.  Id.   Hansen said Almaraz told him he needed to address his concerns through the chain of command.  Id.; *See also*, EOR, Vol. III, p. 354-357.

Hansen testified that he believes this is speech on a matter of public concern because in the past Perry had an open door policy.  EOR, Vol. II, p. 277-278. Hansen reported nothing to Almaraz that would be speech on a matter of public concern.  Instead, a review of the speech discloses it is personal in nature.  The

speech relates, at most, to an explanation of circumstances of his current assignment and his desire to talk to the chief about Malloy's decision to keep him in that assignment due to his low activity. There is nothing about this speech that is of legitimate news or general interest to the community at the time of publication, nor anything about the speech that would enable the public to better evaluate the functioning of an agency. Instead, the report is more akin to information of no relevance beyond the employee's bureaucratic niche. *Tucker v. California Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996). As stated by the *Desrochers'* Court, "we have never held that a simple reference to government functioning automatically qualifies as speech on a matter of public concern. To the contrary, as we have recently indicated, that speech contains 'passing references to public safety [,] incidental to the message conveyed' weighs against a finding of public concern." *Desrochers*, 572 F.3d at 711. The form, context and content of this speech does not support a finding of speech on a matter of public concern.

## B. THE ALLEGED PROTECTED SPEECH WAS NOT A SUBSTANTIAL OR MOTIVATING FACTOR FOR THE ALLEGED ADVERSE EMPLOYMENT ACTIONS.

### 1. The alleged protected speech was not a substantial or motivating factor for the retention in the commercial enforcement position.

Hansen cites to *Burlington Northern and Santa Fe Ry v. White*, 548 U.S. 53, 126 S.Ct. 2405 (2006) and *Allen v. Scribner*, 812 F.2d 426 (9th Cir. 1987) for the proposition that a reassignment is a recognized adverse employment action. Neither of these cases holds that a reassignment is an adverse employment action without regard to the facts and circumstances of the reassignment. Instead, the Court in *Burlington Northern* found that a reassignment of job duties could be an adverse employment action, in the Title VII context, if reassignment of job duties is materially adverse such that the action might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington*

*Northern*, 548 U.S. at 68, 126 S.Ct. at 2415.  Additionally, the Court stated that an assignment of job duties is not automatically an adverse employment action, and whether a reassignment is materially adverse depends upon the circumstances of a particular case.  *Burlington Northern,* 548 U.S. at 71.  Neither of the cited cases holds that retention in an admittedly legitimate, non-retaliatory re-assignment for a longer time period than the employee believes is necessary constitutes an adverse employment action.  In the case at bar, the undisputed facts neither support a finding that the reassignment was an adverse employment action nor that the retention in the assignment constitutes an adverse employment action.

In his deposition, Hansen testified that he is not claiming his reassignment to a traffic assignment from his commercial assignment is an adverse employment action.  EOR, Vol. II, p. 283-284.  Instead, he testified that he believes his retention in the assignment for a longer period of time then he believed was necessary was an adverse employment action.  Hansen does not provide any authority for this proposition.  The Plaintiff has also failed to provide any evidence that the traffic assignment differed in any material way from the commercial assignment.  He does not provide evidence that would support a finding that his duties in traffic were less desirable or more arduous than his duties in commercial.  *See*, *Burlington Northern,* 548 U.S. at 71.  Hansen bears the burden of proof in this regard.  The undisputed facts do not support a finding that the retention in the traffic assignment constitutes an adverse employment action.  On a daily basis, the commercial assignment is more or less like a traffic assignment where you patrol the highway, perform motorist assists, but the trooper focuses enforcement efforts on commercial vehicles.  EOR, Vol. II, p. 190-192.  Troopers assigned to traffic are also required to be certified to perform Part A commercial driver inspections.  Id.  During the time he was assigned to traffic, he was permitted to retain his commercial radio call number, and he was given the opportunity, at least one time

per month, to work a commercial vehicle checksite in order to maintain his Level 1 certification. EOR, Vol. III, p. 344-345, 529-531. He retained his same shift, days off, vehicle, and he remained in the same area. EOR, Vol. IV, p. 652. Hansen admits his assignment to, and retention in, the traffic assignment had no effect on his employment. EOR, Vol. II, p. 284-287. The retention in the assignment had no effect on his pay or benefits. Id. The fact that he was retained in the traffic assignment did not make him feel like he could not speak on matters of public concern. EOR, Vol. II, p. 289. The undisputed facts do not support a finding that the retention in the traffic assignment was reasonably likely to deter a person from engaging in protected speech. By his own admission, it did not. This is not an adverse employment action.

Additionally, the undisputed facts do not support a finding that his alleged protected speech was a substantial or motivating factor for the alleged adverse employment action. Hansen alleges the proof his speech was a substantial or motivating factor is the timing, and the rationale being "in essence," opposition to Plaintiff's speech. Hansen has not provided evidence of either proximity in time or Malloy's opposition to Plaintiff's speech. In the analogous Title VII context, the United States Supreme Court in *Clark County School District v. Breeden*, 532 U.S. 268, 273 -274, 121 S.Ct. 1508 (2001) stated:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that temporal proximity must be "very close." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (C.A. 10 2001). See eg. *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A. 10 1997)(3 month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A. 7 1992)(4-month period insufficient). Actions taken (as here) 20 months later suggest, by itself, no causality at all.

In this case, Hansen learned he was being retained in the traffic assignment shortly before he called former NHP Chief Perry on July 7, 2008. EOR, Vol. II, p. 243. The only incident of alleged protected speech, prior to this alleged adverse employment action, was contained in the 2007 Grievance. This Grievance was filed on January 3, 2008. There is a lapse of at least six (6) months between the alleged protected speech and the retention of Hansen in the traffic assignment. This is not temporal proximity that is "very close." Additionally, the undisputed facts establish legitimate business reasons for Hansen's retention in the traffic assignment. EOR, Vol. IV, p. 652-654. Hansen has not submitted any evidence to dispute those legitimate business reasons. In his deposition, Hansen admitted he has no evidence the reasons given for his retention in traffic are false or inaccurate. EOR, Vol. III, p. 288-289. He also admits that he has no evidence the actions were taken in retaliation for his alleged protected speech. Id. Hansen has failed to show there is a dispute as to a genuine issue of material fact with regard to this alleged retaliatory action. As a result, the District Court properly granted summary judgment in Malloy's favor on the First Amendment retaliation claim.

2.    The alleged protected speech is not a substantial or motivating factor for the 2008 standard performance evaluation.

Hansen cites two cases for the proposition that a negative performance evaluation is an adverse employment action. *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000); *Yartzoff v. Thomas*, 809 F.2d 1371 (9th Cir. 1987). In *Ray*, the plaintiff claimed elimination of an Employee Involvement Program, elimination of a flexible start-time policy, institution of lockdown procedures and reductions in his workload and pay constituted adverse employment actions. *Ray*, 217 F.3d at 1243-1244. In *Ray*, the plaintiff did not claim to have received a negative performance evaluation as an adverse employment action. Instead, in dicta, the *Ray* Court cited language from *Yartzoff* indicating that "transfer of job duties and

undeserved performance ratings, if proven, would constitute adverse employment decisions." *Ray*, 217 F.3d at 1241, quoting *Yartzoff*, 809 F.2d at 1376. The *Yartzoff* Court found the issuance of a sub-average performance rating, and transfer of job duties could constitute adverse employment actions. *Yartzoff*, 809 F.2d at 1375-1376. Both cases involved Title VII retaliations claims and were decided before the United States Supreme Court established the current standard for adverse employment actions in *Burlington Northern*. In *Burlington Northern*, the Court held that a plaintiff must "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern*, 548 U.S. at 2415, 126 S.Ct. at 68. Significantly, Hansen has not cited a single case where the Court had found a standard evaluation constitutes an adverse employment action. At least one Federal District Court Judge has found a standard evaluation, under Nevada's personnel statutes, is not an adverse employment action. *See*, *McGrath v. Nevada Dept. of Public Safety*, 2009 WL 875508, p.2-4 (D. Nev.). The undisputed evidence does not support a finding that the 2008 Evaluation was either materially adverse or undeserved.

The 2008 Evaluation rated the Plaintiff overall Meets Standards. EOR, Vol. IV, p. 645-646. The Evaluation contains "Does Not Meet Standards" (DMS) ratings on Job Elements related to his substantially low enforcement activity. EOR, Vol. II, p. 247-248. The legitimate business reasons for the DMS ratings are set out in detail in the Evaluation, Evaluation reviews, and the responses to the Plaintiff's Grievances at each step in the grievance process. EOR, Vol. III, p. 454-470; Vol. IV, p. 545-546, 655. The DMS ratings were supported by the EMC. EOR, Vol. III, p. 492-497. Hansen agrees the two main reasons stated for the DMS ratings are failure to improve enforcement activity and a substantially low

level of enforcement activity as documented throughout the evaluation period. EOR, Vol. II, p. 247-251. He agrees his commercial enforcement activity actually decreased after being told to increase it in his 2007 Evaluation. EOR, Vol. II, p. 248-249. He agrees his traffic enforcement, between 46 to 80 percent below his peers, is substantially below his peers. EOR, Vol. II, p. 292. He can understand why Sgt. Hoehne would feel the DMS ratings were justified. EOR, Vol. II, p. 252. Hansen admits the evaluation did not cause him to stop speaking on matters of public concern. Id. An overall Meets Standards evaluation, even if it contains DMS ratings on particular Job Elements, is not reasonably likely to deter an employee from engaging in protected activity as it has no negative effect on a classified employee's employment including no effect on pay or benefits. NAC 284.177 and NAC 284.194. Hansen agrees the 2008 "Meets Standards" Evaluation had no effect whatsoever on his employment including no effect on his pay and benefits. EOR, Vol. II, p. 251. Significantly, the Plaintiff has failed to present any additional evidence to support a finding that the 2008 Evaluation constitutes an adverse employment action. The undisputed evidence does not support a finding that the 2008 Evaluation is reasonably likely to deter a person from engaging in protected speech.

Additionally, Hansen has failed to present evidence that the alleged protected speech was a substantial or motivating factor for the DMS ratings on the 2008 Evaluation. There is no proximity in time. The 2007 Evaluation Grievance was filed almost one (1) year prior to the issuance of the 2008 Evaluation, and the alleged protected speech in the July 2007 telephone conversation with Perry was not known to Malloy so it could not have motivated his approval of the 2008 Evaluation. EOR, Vol. II, p. 81-82. *Clark County v. Breeden*, supra, (very close proximity required). Hansen has no evidence the reasons given for his 2008 Evaluation are false. EOR, Vol. II, p. 290. He has no evidence that the 2008

Evaluation was given to him in retaliation for his alleged protected speech. Id. He has no statements or documents that support his belief that these actions were retaliatory in nature. EOR, Vol. II, p. 291-292. Hansen relies on the January 2008 Evaluation of Trooper John Torrise as evidence that an employee, who did not speak out on a matter of public concern, was evaluated using a different methodology than the methodology used on Plaintiff. Apparently, this evaluation is being submitted as evidence that Plaintiff was singled out by using this methodology to justify the 2008 Evaluation and Written reprimand and the March 4, 2009 suspension. The undisputed facts do not support a finding that the evaluation methodology, comparing a trooper's enforcement activity to their peers in the same geographical area, was only used on Hansen in retaliation for his protected speech. First, the same methodology was used to evaluate Hansen's performance prior to him engaging in the alleged protected speech. Hansen's enforcement activity was compared to his peers in his 2006 and his 2007 Evaluations. EOR, Vol. III, p. 398-437. Hansen's own evaluations do not support a finding that he was evaluated using this methodology only after he spoke out on a matter of public concern. Second, the absence of language in the Torrise evaluation, regarding a comparison to his peers, does not prove the NHP was not using this methodology in the region during this time period, and the fact both troopers received DMS ratings in enforcement activity is not evidence that Trooper Hansen was singled out for alleged speech on a matter of public concern. Third, Torrise, and other troopers in the geographical area, had their enforcement activity evaluated using the same methodology as Hansen during the relevant time period. EOR, Vol. II, p. 77-79. Trooper Torrise's evaluation provides no evidence in support of Plaintiff's First Amendment Retaliation Claim. Hansen has failed to raise a genuine issue of material fact with regard to this alleged retaliatory action.

As a result, the District Court properly granted Summary Judgment in favor of Malloy on the First Amendment Retaliation Claim.

        3.   <u>The alleged protected speech is not a substantial or motivating factor for the written reprimand.</u>

For purposes of this appeal, Malloy does not disputed that a written reprimand can be an adverse employment action. However, Malloy has provided undisputed evidence showing a legitimate business reason for the Written Reprimand. The legitimate business reasons for the Written Reprimand are stated therein, and at each step in the grievance process. EOR, Vol. III, p. 478-491. The Written Reprimand was upheld by the EMC. EOR, Vol. III, p. 492-497. Hansen admits he has no evidence his alleged protected speech was a substantial or motivating factor in the decision to issue the Written Reprimand. EOR, Vol. II, p. 292-293. As with the 2008 Evaluation served at the same time, there is no proximity in time. The 2007 Evaluation Grievance was filed almost one (1) year prior to service of the Written Reprimand, and the alleged protected speech in the July 2007 telephone conversation with Perry was not known to Malloy so it could not have motivated his approval of the Written Reprimand. EOR, Vol. II, p. 81-82. *Clark County v. Breeden*, supra, ("very close" proximity in time required). Hansen also admitted he has no statements or documents that led him to believe the action was retaliatory. EOR, Vol. II, p. 291-292. Hansen has no evidence the reasons given for the Written Reprimand are false or pre-textual. EOR, Vol. II, p. 293.

Hansen, citing NAC 284.638, argues that NHP was required to give him an oral warning prior to issuing the Written Reprimand. He alleges he did not receive an oral warning during the year prior to receiving the written reprimand. He claims this is evidence his protected speech was a substantial or motivating factor for the issuance of the written reprimand. The undisputed evidence does not support this argument. Hansen was informed in writing and orally that he needed

to improve his enforcement activity prior to the issuance of the Written Reprimand. He was told he needed to increase his enforcement activity to a level more in line with the average of his peers in the 2006 Evaluation. He did not improve his enforcement activity in comparison to his peers during the next evaluation period. As a result, he received a DMS rating in the areas related to his enforcement activity in the 2007 Evaluation. In this evaluation, he was told clearly, in writing, that he needed to improve his enforcement activity in comparison to his peers. Hansen's 2008 Evaluation documents multiple contacts during the evaluation period through which he was told to increase his enforcement activity. Under Job Element #13, Sgt. Hoehne stated the following in this regard:

> On December 12, 2007, you were given a memorandum from Sergeant Higgins requiring you to increase your activity. You have received documented productivity related counseling sessions and field training over and above your peers. I have had discussions with you concerning your activity and I have provided you with suggestions to help in this area. Our last such discussion was on September 1, 2008 when you expressed your disagreement with me when I suggested during a District meeting that you needed to pick up your activity…

EOR, Vol. IV, p. 545-546, 550-599.

Again following specific instruction to improve his enforcement activity in comparison to his peers, his commercial enforcement activity actually decreased 33 percent from his prior Evaluation, and his traffic enforcement activity was between 46 percent and 80 percent below his peers. Id; EOR, Vol. II, p. 247-251. The 2008 Evaluation documents enforcement activity that is substantially below his peers in the same geographical area. Id; EOR, Vol. II, p. 292. Hansen does not dispute the accuracy of the numbers in his 2008 evaluation. EOR, Vol. II, p. 247-251. The undisputed evidence shows Hansen received substantial written and verbal instructions to increase enforcement activity. NAC 284.638 does not require any more than occurred in this case. In fact, even an oral warning is not

required "where more severe initial action is warranted." Again, this is an issue Hansen apparently raised before the EMC, and the EMC upheld the written reprimand. EOR, Vol. III, p. 4478-497. Hansen is bound by the decision of the EMC. Hansen has failed to raise a genuine issue of material fact with regard to this alleged retaliatory action. As a result, the District Court properly granted summary judgment in favor of Malloy on the First Amendment Retaliation Claim.

4.   <u>The alleged protected speech is not a substantial or motivating factor for the five day suspension.</u>

Hansen continues to claim the five (5) day suspension is an adverse employment action despite his agreement to the suspension. Hansen provides a number of reasons he agreed to the suspension. These post hoc, self-serving, reasons are being stated for the first time as part of this action. Hansen misses the critical point of the argument that an action is not reasonably likely to deter a person from engaging in protected speech when the person has consented to the action. Hansen does not suggest that he learned some new facts, after entering into a written agreement consenting to the five day suspension, that indicated Malloy suspended him in retaliation for engaging in alleged protected speech. To the contrary, Hansen admits he has no evidence Malloy recommended the five day suspension in retaliation for his alleged protected speech. EOR, Vol. II, p. 307. It would be unreasonable to permit a plaintiff to claim an action is an adverse employment after they have agreed to the imposition of the action. The reasons Hansen now gives for his agreement to the imposition of the action should be irrelevant. Hansen has not provided any authority to the contrary.

Finally, even if Hansen is permitted to use the suspension as an adverse employment action, Hansen has not provided any evidence which demonstrates his alleged protected speech was a substantial or motivating factor for the suspension. Hansen admits he has no evidence the reasons for the suspension are false. He has

no evidence the reasons for the suspension are different than those stated in the SOC. EOR, Vol. II, p. 307. Hansen agrees the substandard ratings in enforcement activity in the 2007 evaluation, the substandard ratings in the 2008 evaluation, the Written Reprimand for substantially low enforcement activity and the only slight improvement in his enforcement activity following the 2008 Evaluation and Written Reprimand provide a legitimate reason for the suspension. EOR, Vol. II, p. 304-307. The legitimate, non-retaliatory reasons for the action are set out in detail in the SOC and the Pre-Disciplinary Hearing Officer's Memo. EOR, Vol. III, p. 498-512; Vol. IV p. 547, 654. There is no proximity in time, no statements by Malloy in opposition to his allege protected speech, and no evidence of falsity or pretext in the reasons given for the action. These are the undisputed facts related to the suspension. The removal of grounds for discipline from the SOC, as part of a settlement agreement, does not prove those grounds were not supportable, and certainly does not prove the reasons given for the suspension are a pretext. A comparison of the original SOC and the revised SOC shows the factual reasons for the suspension remained the same. EOR, Vol. III, p. 500-512; Vol. IV, p. 694-706. Significantly, Hansen's own admissions, cited above, are contrary to his argument. Hansen has failed to raise a genuine issue of material fact with regard to this alleged retaliatory action. As a result, the District Court properly granted summary judgment in Malloy's favor on the First Amendment Retaliation Claim.

> 5. <u>The alleged protected speech is not a substantial or motivating factor for the Biven's statement.</u>

Hansen provides no evidence to prove Lt. Biven's memo constituted a retaliatory adverse employment action. Instead, he provides a single citation to the *Coszalter* case with the statement that a threat of discipline can be an adverse employment action. Appellant's Opening Brief, p. 15-16 . The *Coszalter* Court did not hold that a threat of discipline, standing alone, constitutes an adverse

employment action.  Instead, the Court lists a series of thirteen (13) employment actions, including a threat of disciplinary action, and states that some, perhaps all, of the listed actions were adverse employment actions for purposes of the plaintiff's First Amendment retaliation claim.  *Coszalter v. City of Salem*, 320 F.3d 968, 976-977 (9th Cir. 2003).  Following the list, the *Coszalter* Court stated that when all of the acts are taken together, it is clear the acts amounted to a severe and sustained campaign of employer retaliation that was reasonably likely to deter plaintiff from engaging in protected speech. Id.  In the case at bar, Hansen has not alleged multiple acts that amount to a severe and sustained campaign of retaliation by Malloy.  To the contrary, the undisputed facts in this case disclose there was no action taken through the memo, and there was no action taken as a result of the memo.  EOR, Vol. II, p. 282-283.  Significantly, Hansen has provided no evidence his alleged protected speech was a substantial or motivating factor for the statement in the memo.  Hansen has failed to raise a genuine issue of material fact with regard to this alleged retaliatory action.   As a result, the District Court properly granted summary judgment in Malloy's favor on the First Amendment Retaliation Claim.

**C.    THE UNDISPUTED EVIDENCE DEMONSTRATES THE ALLEGED ADVERSE EMPLOYMENT ACTIONS WOULD HAVE BEEN TAKEN ABSENT THE PROTECTED SPEECH.**

Malloy is entitled to entry of summary judgment in his favor because the undisputed evidence shows Malloy "would have reached the same alleged adverse employment decisions even in the absence of the employee's protected conduct." *Eng v. Cooley*, 552 F.3d 1062, 1072 (9th Cir. 2009).  "In other words, [they] may avoid liability by showing that the employee's protected speech was not a 'but for' cause of the adverse employment action." Id.  "This question relates to, but is distinct from, the Plaintiff's burden to show the protected conduct was a substantial or motivating factor."  Id.  As set out more fully above, Hansen has failed to

provide evidence to support a finding that Malloy took the actions in retaliation for the protected conduct.  On the other hand, the undisputed evidence in this case shows a well-documented history of low enforcement activity on the part of Hansen, and his failure to improve his enforcement activity after being instructed to do so.  The legitimate, non-retaliatory reasons for each alleged adverse employment action are set out in detail above and in the documents supporting each of those actions.  In the case of each of the actions, Hansen has testified that he has no evidence of a retaliatory motive for the actions.  The undisputed evidence establishes the "but for" cause for each of actions was his unprotected behavior.  Malloy has met his burden on this element, and Hansen has failed to demonstrate there is a genuine issue of material fact on this element.  As a result, the District Court properly granted summary judgment in favor of Malloy on the First Amendment Retaliation Claim.

## V.    CONCLUSION

The undisputed facts do not support Hansen's First Amendment Retaliation Claim.  Hansen has failed to raise a genuine issue of material fact with regard to that Claim.  Therefore, the District Court properly granted summary judgment in favor of Malloy on the First Amendment Retaliation Claim.  Malloy would respectfully request the Court affirm the District Court's order granting summary judgment.

DATED this 23rd day of March, 2012.

CATHERINE CORTEZ MASTO
Attorney General

By: _____/s/  Michael D. Jensen_____
MICHAEL D. JENSEN
Senior Deputy Attorney General

*Attorneys for Defendant-Appellee*

## <u>STATEMENT OF RELATED CASES</u>

Appellee is unaware of any related cases to the instant matter.

## <u>CERTIFICATE OF COMPLIANCE</u>

COMES NOW, the Appellee, by and through counsel, CATHERINE CORTEZ MASTO, Attorney General, and MICHAEL D. JENSEN, Senior Deputy Attorney General, and hereby certifies that this brief is proportionately spaced, has a typeface of Times New Roman 14 point, and contains a word count of 12,488 words.

DATED this 23rd day of March, 2012.

CATHERINE CORTEZ MASTO
Attorney General

By:   ____/s/ Michael D. Jensen_____
MICHAEL D. JENSEN
Senior Deputy Attorney General

*Attorneys for Defendant-Appellee*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 23, 2012.

I certify that all participants in the case are registered CM/ECF users and that the service will be accomplished by the appellate CM/ECF system.

DATED this 23rd day of March, 2012.

                              /s/  Janice M. Riherd
                              JANICE M. RIHERD
                              An Employee of the State of Nevada